UNITED STATES, Appellee

v

EARL W. DUTCHER, Airman Third Class,
U. S. Air Force, Appellant

7 USCMA 439, 22 CMR 229

No. 8352

Decided December 21, 1956

*Captain Richard C. Bocken* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Stanley S. Butt.*

*Major Fred C. Vowell* argued the cause for Appellee, United States. With him on the brief was *Captain Lawrence J. Gross.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused was tried by a general court-martial on charges alleging larceny and four separate offenses of forgery, in violation of the Uniform Code of Military Justice, Articles 121 and 123, 50 USC §§ 715 and 717, respectively. He pleaded guilty to the counts of forgery and not guilty to the larceny, but was convicted on all specifications. He was sentenced to dishonorable discharge, total forfeitures, and confinement for twenty years. However, the convening authority approved only so much of the sentence as provided for dishonorable discharge, total forfeitures, and confinement for ten years. A board of review in the office of The Judge Advocate General of the Air Force thereafter affirmed, and accused sought reversal here of his conviction for larceny. We elected to hear arguments on the sole issue of whether his pretrial statement was erroneously admitted into evidence at trial.

On August 18, 1955, at approximately 7:30 p.m., Major Hollis W. Russell, accused's squadron commander, accompanied by Technical Sergeant Robinson, duty sergeant of accused's organization, Airman Ward, and Sergeant Schmidt of the Air Police, drove in Major Russell's automobile to the off-base home of the accused located in Schertz, Texas. The accused was suspected of the recently-discovered theft of money from Airman Ward. Major Russell drove into the driveway on the property where the accused resided, and accused appeared at the door. Apparently discerning the identity of the parties, he started to effect a retreat into the house, at which time Major Russell called him, saying, "Dutcher, we want to see you." The officer was fully attired in military uniform, and accused, who was off duty, was dressed in civilian clothing. The accused complied with the direction and walked up to Major Russell, who asked him, "Would you mind going through your billfold?" Accused replied, "No", and handed the wallet to Major Russell, who returned it saying, "Go through it yourself." Accused removed part of the contents of the billfold, which included a ten dollar bill and two one dollar bills. Major Russell then asked accused to search another portion of the billfold which accused was covering with his finger. Accused complied and uncov-

440

ered three more ten dollar bills. The total amount found in the accused's billfold was the exact sum and in the identical denominations as the money which was missing. Major Russell considered his request that accused go through his billfold to be an order, but at no time prior to the discovery of the money did the officer inform the accused that he was under arrest or apprehension. Major Russell then drove the accused to the Base Guardhouse, a drive which required some thirty minutes to complete. Some thirty or forty minutes after confinement, and after having been warned in accordance with Article 31, accused executed a written confession to the larceny.

The prosecution attempted to introduce accused's written confession into evidence at the trial. Defense counsel objected to its admission, contending that the confession was the fruit of an illegal search and seizure, and, therefore, was inadmissible in evidence. He argued that the search and seizure was unreasonable and without justification, and that it tainted the confession which was procured within a short time thereafter. The law officer, however, in an out-of-court hearing, reached a contrary conclusion and admitted the confession into evidence. It is this ruling which accused here seeks to have us overturn.

## II

In my view, it is doubtful strategy to avoid deciding the question of the legality of this search, for I believe that if it was unlawful a very strong argument can be made that it, together with the pressures which immediately followed, deprived the accused of his mental freedom to confess or deny his guilt. If the search was unreasonable, then the accused was confronted with wrongfully obtained incriminating evidence in the possession of agents for the Government. Added to that is the coercive effect of the presence, activities, and conversations of a squadron commander, accused's duty sergeant, air policemen, and a criminal investigator who interrogated the accused because he had been told the stolen money had been found in the possession of the accused. The period from apprehension to confession was extremely short and, at best, we have a unitary transaction which would tend to overawe and frighten an enlisted man and which could hardly be interrupted by a warning unless great care was exercised to make certain the suspect understood he was not being coerced into talking. Only the most seasoned wrongdoer could retain his freedom of thought under those conditions, and I do not wonder that the confession was easily obtained. The cat was out of the bag with a vengeance, and if wrongfully so, a causal connection seems quite plain.

Aside from the foregoing, a reading of the out-of-court hearing transcript will disclose that the only real issue in dispute was the legality of the search. That question was the predicate for a rcommendation by the assistant staff judge advocate that a rehearing be granted. The staff judge advocate disagreed because he believed that the search was legal. The board of review based its opinion solely on the legality of the arrest, appellant's brief raised the issue, and our grant was limited to the question of whether the confession was obtained as a result of either an illegal search and seizure or a failure to warn. Aside from one disconnected comment by the law officer, no one has given any consideration to the question now used to dispose of the appeal. Nonetheless, my associates have elected not to decide the only crucial issue in the case, and thus what is said in this opinion concerning the lawfulness of the search represents views which are mine alone.

To support their contention that the search was unlawful, defense counsel assert that a commanding officer has no inherent power to search a member of his command outside a military reservation; that the search was not incident to lawful arrest or apprehension; that it was not made under circumstances demanding immediate action to prevent removal or concealment of criminal goods; and that the search was made without the consent of the accused. While I do not cast aside the long-established rule that an appropriate commander has the inherent power to search the person of a member of his

**441**

command, I need not decide the validity of that principle, for if I can uphold the search as lawful on any single ground, I need not probe other facets of the argument. For the purposes of this case, I need go no further than to reaffirm the principles we have already announced.

In United States v Florence, 1 USCMA 620, 5 CMR 48, we adopted the longstanding civilian rule █ that searches incident to lawful arrest are legal. We noted that in the civilian community only unreasonable searches are prohibited by the Fourth Amendment, and that searches incident to lawful arrest do not fall within that category. Certainly, if they are not unreasonable according to civilian standards, they would not be unreasonable in the military community, for in the latter, conditions quite often demand immediate and summary action. I invite attention to the cases cited therein for those who may be interested in the development of the civilian rule.

In the Florence case, supra, we were faced with a search conducted within what was at least a tempo- █ rary military station, and we elected to test the reasonableness of that search by the principles set out in the 1949 Manual for Courts-Martial. In that instance, in deciding that an order directing the accused to report to his commanding officer constituted the initiatory step in an arrest, and that a search subsequent to such order was reasonable, we said:

". . . The Manual for Courts-Martial, U. S. Army, 1949, defines arrest as moral restraint imposed upon a person by oral or written orders of competent authority, limiting his personal liberty in the disposition of charges. . . .

. . . . . . .

"Under military procedure arrest may be the final step in a series of disassociated acts from receipt of information of a supposed offense to confinement, or it may be the end of a sequence of events so closely inter-related that it is impossible to fix the point of actual deprivation of liberty. In this case it appears the latter situation existed and that the initiatory step in the arrest was the order directing the accused to report. . . ."

When I turn to the present case, I find that the Code and the Manual for Courts-Martial, United States, 1951, have changed the principles and redefined words of art in some degree. Article 7 of the Uniform Code of Military Justice, 50 USC § 561, defines apprehension and designates those individuals who are authorized to apprehend one suspected of an offense. It provides:

"(a) Apprehension is the taking into custody of a person.

"(b) Any person authorized under regulations governing the armed forces to apprehend persons subject to this code or to trial thereunder may do so upon reasonable belief that an offense has been committed and that the person apprehended committed it."

Under the present Code, then, it would appear that what we labeled an initiatory step in an arrest in Florence, supra, must now be designated as an initial step in apprehension. The latter form of restraint becomes important, because if it is lawfully imposed, a search incidental thereto is reasonable. That conclusion is supported by the provisions of the Manual for Courts-Martial, United States, 1951, paragraph 152, page 288, which states in part:

"The following searches are among those which are lawful:

. . . . . . .

"A search of an individual's person, of the clothing he is wearing, and of the property in his immediate possession or control, conducted as an incident of lawfully apprehending him."

Some argument is advanced that the search was not incident to legal apprehension because the officer █ failed to notify the accused that he was taken into custody. Obviously, it is the better practice to advise the accused specifically of his status before the search is insti-

442

gated, but here there was no doubt in the accused's or the officer's mind that the order was given to deter the accused from re-entering the house and restrict his freedom of movement, because he was suspected of having committed an offense.

In the final analysis, the question before the law officer was whether, in law, the facts established an apprehension and a search incidental thereto. Here, they disclosed a group organized to apprehend the suspect, followed immediately by a direct journey to accused's place of living where he was restrained, searched, and thereafter incarcerated. True enough, a series of events took place, but all were part of one continuous transaction. While the restraint was first in point of time, the different steps were not disassociated, and if the apprehension did not precede it, it was at least, contemporaneous with the search. Certainly, in the light of the authority of a commanding officer to substitute his order to search for that of a civilian search and seizure warrant, I am not disposed to isolate a unitary transaction concerning the person into many component parts and test the legality of each one by seconds measured on a stopwatch. Let it suffice to say that when the facts disclosed by this record are considered in their totality, they show apprehension, search, and confinement so closely interwoven that a finding by the law officer that the search was only incidentally a part of the whole transaction is supported by the record.

My previous conclusion leaves for determination the question of whether the commanding officer had ■■■■■■ ■ reasonable cause to believe the accused had committed the larceny, for if he did he acted well within the powers of one who has less authority than a commander. I encounter little difficulty in answering that issue affirmatively. At the time he drove to accused's home, the officer knew that money had just been taken from the victim's wallet, and the taking was without authorization. The accused was alone in the barracks at the locus of the crime just before the loss was discovered, and the wallet had been left untended by its owner for only about fifteen minutes. The accused had left the area, and the subject of the theft was money which could easily be hidden on the person or destroyed. If the officer needed more to support his belief that Dutcher was the culprit, it was furnished when he arrived at the home of the accused. The officer was dressed in uniform and was accompanied by a Duty Sergeant from accused's unit, an Air Policeman, and the victim of the theft, who the record shows was known to the accused. As the group—which under ordinary circumstances might be considered as friendly—drove up, accused started out of his house, but, after seeing its composition, he gave evidence of a guilty mind by turning abruptly to flee. He stopped only when he heard a verbal order to proceed to the position of his commanding officer. It was after regular duty hours, and accused was confronted at such close quarters as to enable him to identify the members of the searching party. It is not difficult to believe, and the law officer was entitled to find, that accused immediately realized the purpose of the visit, and his intuitive act of seeking refuge in his home could properly be regarded as a factor identifying him as the perpetrator of the offense. Under all the circumstances, I conclude the commanding officer had reasonable grounds to believe the accused had stolen the money and good cause to apprehend and search him.

The decision of the board of review is affirmed.

QUINN, Chief Judge (concurring in the result):

If a ruling by the law officer can properly be sustained on one ground, it is unnecessary to con- ■■■■■■ ■ sider whether it satisfies other grounds. United States v Leach, 7 USCMA 388, 22 CMR 178. Consideration of the so-called "inherent right" of a commanding officer to order an off-base search of personnel under his command is unnecessary to the disposition of this case. Consequently, I do not concur in the broad statements made in the principal opinion on that point. See United

States v DeLeo, 5 USCMA 148, 17 CMR 148.

Regardless of the purported illegality of the search, the ruling admitting the accused's pretrial state- ██ █ ment into evidence can be sustained. Contrary to the principal opinion's assertion that the "only real issue in dispute was the legality of the search," I believe the evidence shows that the effect of the search on the accused's later confession was strongly contested. At the outset of the hearing on this question, both counsel argued whether the preliminary advice concerning his rights under Article 31, Uniform Code of Military Justice, 50 USC § 602, which was given to the accused interrupted, as a matter of law, the "chain of causation" between the search and the statement. See United States v DeLeo, supra, page 162, footnote 4. The law officer held that the DeLeo case raised "sufficient doubt," and he permitted the accused to present evidence of the circumstances of the search and whether the search "tainted" the proffered confession.

True, in presenting his evidence defense counsel's major effort was directed to showing that only about an hour intervened between the search and the accused's interrogation at the Air Police office. The simple explanation for his failure to do more is that he had no other evidence on the connection between the search and the accused's confession. The accused himself did not testify as to the reasons which induced him to confess. Referring to a like failure to testify, Judge Brosman, writing for a unanimous Court in United States v Howell, 5 USCMA 664, 667, 18 CMR 288, said: "Certainly the accused—who must have known better than others—did not suggest that he was induced to speak because of anything said by Fincher. He said nothing at all on the subject—nor did any other witness."

On the other hand, the investigator who obtained the statement from the accused testified that the accused's statement was "probably the easiest" he had ever procured from an accused in two and one-half years of investigative work. He said that after the accused had been advised of his rights under Article 31, he never "hesitated" or showed any reluctance whatever about providing a statement. It was also shown that while the accused's wallet containing the stolen money was on the Desk Sergeant's desk, it was never exhibited to the accused. Moreover, neither Major Russell nor any of the others in the group at the search was present in the room in which the accused was interrogated. At the conclusion of the testimony, the law officer specifically ruled that even if the search was illegal, it did not "taint" the confession. In my opinion, the evidence supports the ruling. United States v Howell, supra. Accordingly, I concur in the result of the principal opinion.

FERGUSON, Judge:

I concur in the result for the reasons expressed in Chief Judge Quinn's opinion.