UNITED STATES, Appellee

v

CHARLIE GREEN, Private E–2, U. S. Army, Appellant

7 USCMA 539, 23 CMR 3

No. 8856

Decided February 1, 1957

*First Lieutenant Gene E. Overbeck* argued the cause for Appellant, Accused. With him on the brief was *Major Frank C. Stetson.*

*First Lieutenant William K. Davenport* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton, First Lieutenant James G. Duffy,* and *First Lieutenant Lewis W. Evans.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused was convicted by general court-martial of two violations of a general regulation, in that he operated an unregistered motor vehicle and displayed invalid license plates thereon, both in violation of Article 92, Uniform Code of Military Justice, 10 USC § 892. In addition, he was found guilty of receiving stolen property in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. He was sentenced to a bad-conduct discharge, total forfeitures, and confinement at hard labor for nine months. The convening authority disapproved the offense relating to the receipt of stolen property but otherwise approved. The board of review affirmed, and we granted review to determine the admissibility of the accused's pretrial statement.

During the time period encompassing these offenses, a general regulation published by Headquarters, United States Army, Europe, together with its annexes, provided that every owner of a motor vehicle must register his vehicle before operating it and that he must have affixed thereto valid license plates. On July 2, 1955, the accused registered an automobile with the United States Army Motor Vehicle Registration Office in Germany. After he produced a title certificate and insurance papers for the vehicle, license plates were issued to him. Four days later, these license plates and the registration certificate were cancelled, and the automobile was never thereafter re-registered with the official registrar.

Sometime during the period July 30, 1955, to August 13, 1955, a set of license plates bearing the number 5C–56962 were stolen from the automobile of Sergeant First Class Joseph Yemma. On November 12, 1955, the accused was transferred to a new unit and filled out

540

an organizational form which was not transmitted to higher headquarters. In that document he listed his license number as being that of the plates which had been cancelled in July. However, he did not reveal the fact of cancellation.

On November 17, 1955, Mr. Richard Fuchs, a German national, was driving his automobile in the vicinity of Reichenbach, Germany, when he was forced to stop suddenly to avoid an oncoming truck. Suddenly, Mr. Fuchs' automobile was struck from behind by a car driven by the accused and bearing the license plates removed from the car of Sergeant Yemma. Two days thereafter, at about 7:00 p.m., Private Frederick Kellum, a military policeman who was off duty at the time, happened to see a vehicle bearing license plates numbered 5C–56962 as it was being parked by the accused near a cafe in Baumholder, Germany. He recalled a report to be on the lookout for these license plates and accordingly caused Lieutenant Edward R. Fye, the military police duty officer, to be notified. Lieutenant Fye picked up Private Kellum, proceeded to the cafe, entered, and questioned the accused to the extent shown in the out-of-court conference which will be subsequently discussed. Thereafter, Lieutenant Fye took the accused to the military police station and informed him of his rights under Article 31 of the Code, 10 USC § 831. At that time, the accused admitted in substance that he was the owner of the vehicle upon which was displayed the stolen license plates but denied that he had known that they were stolen. His first assertion was to the effect that he had received the license plates from a sergeant friend but thereafter modified his story by stating that he had received the plates from a captain in the military police. At this time, the accused also handed over a certificate of title to the automobile.

In an out-of-court hearing, it was shown that at the time when Lieutenant Fye approached the accused in the cafe, he merely asked the accused if he was the owner of the automobile in question and that an affirmative answer was given. The law officer ruled that this admission was inadmissible because the officer had not first advised the accused of his rights under Article 31 of the Code. Thereafter, defense counsel objected to the admission into evidence of the accused's later statement on the theory that the prior inadmissible admission had induced the subsequent statement. The objection was overruled by the law officer, and this is the ruling which accused contends was erroneous and prejudicial.

It is first of all worth repeating that the general regulation upon which this prosecution was bottomed required the registration of motor vehicles by those persons who *owned* such vehicles and that the accused's admission concerning ownership of the automobile regarded—within the meaning of Article 31(b)—the offenses alleged against the accused. United States v Taylor, 5 USCMA 178, 17 CMR 178. Furthermore, Lieutenant Fye occupied an official position in connection with law enforcement, the inquiry was made pursuant to an official investigation, and the facts were far enough developed so as to give Lieutenant Fye good cause to believe that the accused was the owner of the vehicle, for he had been seen operating it by Private Kellum. Accordingly, we have little hesitancy in concluding that the law officer had a reasonable basis for his ruling that the accused's initial admission of ownership, which was made before a warning was given, was inadmissible. Moreover, the ruling was beneficial to the accused and, for obvious reasons, he now relies upon the ruling as a supporting arch for his claim of error. Thus our present issue is whether, as a matter of law, the first admission rendered inadmissible the subsequent statement, which was made after warning, was in every other way voluntary and was used by the Government. United States v Dandaneau, 5 USCMA 462, 18 CMR 86.

We think the law officer had a solid ground for his ruling that the first admission of ownership did not induce the accused's later statement to the same effect. The accused was fully

advised as to the meaning of Article 31 before his interrogation at the military police station, and stated that he understood its terms. It is a fair inference, then, that he was aware of his right to remain silent. He had been a master sergeant as late as July 1955, and it is unlikely that he was coerced or frightened by the rank of his interrogator, for surely he was not a newcomer to the Service. He had previously registered this vehicle with the appropriate authorities and certainly knew that they would have a record of his ownership, even though the registration had been cancelled. All that the investigating officer needed to do to ascertain the true ownership was to communicate with the appropriate registration official. Just one week prior to his questioning, the accused had listed his automobile with his unit, had admitted ownership at that time, and must have known that that record was available. When the last interrogation began, Lieutenant Fye asked him for the certificate of title to the vehicle. The accused replied that this document was at his home. When the Lieutenant observed that the best way to settle this matter would be to go to his home and obtain the title, the accused replied that such a trip would not be necessary, meanwhile removing the certificate of title from his pocket and handing it to the officer. All of this time, of course, the accused knew that he was in possession of the evidence of title and that a search would reveal it.

When these factors are marshaled, they lead to the conclusion, within the operation of a fair mind, that the accused admitted ownership of the automobile, not because he had orally disclosed the information to the Lieutenant earlier, but, because he knew he could not successfully deny it and silence would avail him nothing. Information as to his ownership was available from too many convenient sources to permit him to be coercively influenced by his earlier answer to one question. Any carry-over from the first admission to the final confession, if present, is not measurable. It necessarily follows that the law officer's rul-

ing is supported by the evidence and cannot be overturned here. United States v Bennett, 7 USCMA 97, 21 CMR 223.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (concurring in part):

I concur.

I agree with the principal opinion that the law officer was correct in his ruling that the statement ▮ made by the accused after he had been advised of his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831, was not induced by an earlier inadmissible statement and was therefore admissible. Under the circumstances of this case I cannot say that the law officer erred as a matter of law in his holding that the subsequent statement was not involuntary.

However, in the result reached by a majority of the Court in United States v Dutcher, 7 USCMA 439, 22 CMR 229, it was noted that if a ruling by the law officer can properly be sustained on one ground, it is unnecessary to consider whether it satisfies other grounds. For that reason I believe it unnecessary to go into the question of whether the law officer was correct in ruling that the first statement was inadmissible because it was obtained in violation of Article 31(b). In particular, ▮ lar, I wish to disassociate myself from the proposition set forth in United States v Gibson, 3 USCMA 746, 14 CMR 164, and United States v Dandaneau, 5 USCMA 462, 18 CMR 86, and endorsed above, that a prerequisite to the application of the provisions of Article 31, supra, is "officiality" of investigation or of the questioner. All persons subject to the Code must fulfill the prerequisites of Article 31 before they may interrogate or request any statement from an accused or person suspected of an offense. The fact that a person compelling another person to incriminate himself or answer a question, the answer to which might incriminate him, is not acting in an official capacity does not mean that

542

Article 31(a) has not been violated. Any person subject to the Code is, in my opinion, required to fulfill the provisions of Article 31(b) before asking any questions, of a person accused or suspected of an offense, pertaining to the suspected offense.

However, in this case the *challenged* ruling was that a subsequent statement was not "tainted"; i.e., that the circumstances of the first statement did not render the questioned statement involuntary and hence inadmissible. We agree that it was not.