UNITED STATES, Appellant

v

RICHARD A. SPERO, Hospital Apprentice, U. S. Navy, Appellee

8 USCMA 110, 23 CMR 334

111

No. 9686

Decided July 5, 1957

*Lieutenant Colonel Charles H. Beale, Jr.*, USMC, argued the cause for Appellant, United States.

*Lieutenant (jg) W. W. McNeilly, Jr.*, USNR, argued the cause for Appellee, Accused.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

A divided board of review reversed the accused's conviction by a special court-martial of six specifications alleging the making of obscene telephone calls to Navy nurses. The board of review held it was prejudicial error to admit into evidence a confession by the accused because it was the product of a prior illegal statement. In accordance with the provisions of Article 67(b)(2), Uniform Code of Military Justice, 10 USC § 867, The Judge Advocate General of the Navy certified the following question for our consideration: "Was the confession of the accused admissible in evidence?"

In reviewing the decision of the board of review, we are required to determine first whether the board of review predicated its holding upon findings of fact or on matters of law. As to matters of law, we are free to review the board of review's conclusions without limitations. But, if the board of review acted in its fact-finding capacity, our review is confined to whether there is evidence in the record of trial to support the findings; and, in that respect, it is immaterial whether we would ourselves have made different findings. United States v Bunting, 6 USCMA 170, 19 CMR 296; United States v Moreno, 6 USCMA 388, 20 CMR 104.

Each of the three members of the board of review filed a separate opinion. The dissenting member clearly based his holding on his evaluation of the evidence. The concurring opinion is not as specific as that of the dissent, but it too leaves no room to doubt that it is based, in part, on a reappraisal of the facts. However, the concurring member applied the facts he found to "the law . . . in the principal opinion." His opinion then turns upon a question of law. The principal opinion decides the issue of admissibility entirely in terms of legal principle. Thus, its author first quotes a part of this Court's opinion in United States v Bennett, 7 USCMA 97, 21 CMR 223, it which we "announce[d] the rule" applicable to a situation such as that present in this case, and concludes that the evidence does not meet the test prescribed. Clearly then we can consider the certified question in a modified form. Without infringing on the fact-finding power of the board of review, we can determine whether the evidence is legally sufficient to meet the standard set out in our Bennett opinion, and purportedly applied in the majority opinions of the board of review.

The Bennett case defined the measure of proof required to show that later acquired evidence is not the product of evidence previously acquired illegally, as follows:

". . . we now announce the rule that if the Government obtains admissions illegally, and they are of a nature likely to produce a subsequent confession, a strong showing that a subsequent warning severed the presumptive influence must be made to permit use of the confession. Furthermore, absent any showing that the accused knew or had been informed that his prior admissions could not be used against him, the fact that he was advised of his rights

112

prior to the execution of his confession would normally not avoid the Taylor [5 USCMA 178, 17 CMR 178] result." [Page 101.]

The rule set out in Bennett is no different from that announced earlier in United States v Monge, 1 USCMA 95, 2 CMR 1. Both opinions simply emphasize the Government's responsibility for showing that a confession is voluntary. Common sense suggests that, if it appears the confession offered was the likely product of other evidence which was illegally obtained, the Government has a heavier burden than in a case in which the statement stands apart from any such possible taint. That is all that our Bennett opinion was intended to say, and that is all that we think it says.

Apart from the requirement of a warning under Article 31, Uniform Code of Military Justice, ██ 10 USC § 831, the problem in regard to the admissibility of a confession is at all times one of proof of voluntariness. If the Government illegally obtains evidence which is "likely to produce a subsequent confession," and, in fact, the accused later confesses, it is reasonable to conclude that the confession was more the product of the illegal evidence than the expression of the free will of the accused. As a result, the confession carries the taint of the illegality of the other evidence, and the Government has not met the burden of proof of voluntariness imposed upon it. Considering the problem of successive confessions in the Monge case, we said:

". . . the subsequent confession is presumptively the result of the same influence which affected the prior confession until the prosecution establishes the contrary. This rule is accepted in most jurisdictions. [citing authorities] But the rule states no more than the practical deduction which may be drawn from the circumstances, aptly stated in the quotation from United States v Bayer, supra. The question remains one of fact. We may say, legally, that the prior improper influences are 'presumed to continue,' or we may

state, practically, that the effects naturally linger in the accused's mind and that this becomes another factor—to be sure, a weighty one—in deciding whether the subsequent confession was, in fact, involuntary. It is deceptive to say that the prosecution must establish that the improper influences have been dissipated. The continuing effect of the coercive practices must still be determined from all the circumstances. There must be considered, among other things, the mental character of the accused, the nature and degree of the influence, the time intervening between the confessions, and all the circumstances surrounding the subsequent confession in deciding whether the accused possessed that mental freedom required to make the confession voluntary." [Page 99.]

What are the circumstances in this case? About 9:00 o'clock on the morning of May 22, 1956, the accused was approached by Chief Master at Arms R. McCallen of the Naval Hospital Security Office, Naval Air Station, Corpus Christi, Texas, and Lieutenant M. D. Bergquist, Chief of the Security Division. The accused was just leaving the hospital bag room. Without mention of Article 31 of the Uniform Code, 10 USC § 831, he was questioned as to what he had been doing in the room. He replied that he had telephoned a Wave. In response to further questioning, he disclosed her name and where she could be reached. The lieutenant called the Wave. When he had concluded his conversation, the accused asked, "What is this, Mr. Bergquist?" He was told that he was suspected of making the obscene anonymous telephone calls to the Navy nurses. At that point, he was advised of his rights under Article 31, supra. The accused denied making the calls. He was then taken to the Security Office. He sat in the outer office in the company of Chief McCallen "until chow time." The chief proposed to take him to the dining hall for lunch, but the accused asked to go to the snack bar because he felt too nervous. Accordingly, they went to the snack bar, but the accused did not "want anything." A half hour later, they left,

**113**

and at the accused's request took a walk. They returned to the Security Office a little before 1:00 p.m. At no time during the period that the chief was with the accused was the accused threatened, made any promises, or interrogated at length.

At 2:00 p.m., Chief S. B. Williams of the Air Station Security Office took the accused into custody and brought him to his office. There he informed the accused that he was suspected of making the lewd telephone calls, and advised him of his rights under Article 31, supra. He asked the accused whether he understood his rights, and the accused answered "yes." The accused made an oral statement. When he had finished, Chief Williams asked him if he would put the statement into writing. The accused agreed. A mimeographed form was produced. The form contained a certificate at the top, with appropriate blanks for insertion of the name of the accused, that of the investigator, and the nature of the offense of which he was suspected, which, in essence, acknowledged advice as to the offense and the privileges accorded by Article 31, Uniform Code, 10 USC § 831. The blanks were completed by Chief Williams, and the certificate was read to the accused. The accused was then taken to another room and "left alone to write his statement."

Somewhat later, the accused called Chief·Williams and returned the form to him. On it, he had written out a statement of the offenses which he admitted he had committed. He signed the statement in the presence of both Chief Williams and Lt. Bergquist, who had come into the Security Office a few minutes before. Prior to signing, the accused was asked by the lieutenant whether he knew that he didn't have to make any statement, and he "assured" the lieutenant that he did. It was then ten minutes after four o'clock in the afternoon. No promises or threats of any kind had been made to the accused to induce him to make the statement.

The accused objected to the admission of his confession on the ground that it resulted from the earlier improper questioning by Lt. Bergquist. He elected to testify on the issue. The major part of his testimony is concerned with the fact that, because of "previous contacts" with Lt. Bergquist, he was "afraid of him," both within and outside his presence. He was also afraid of Chief Williams. His fear led him to believe he "had to tell them about the offenses." He also maintained that Chief Williams promised him that "nothing will happen" if he gave a statement and the phone calls were stopped. Furthermore, he contended that he had not been informed of the specific provisions of Article 31, supra, and had not been told that any statement he made could be used against him in a court-martial. On cross-examination, however, he admitted that his fear consisted also of his apprehension of "going to the brig." He further acknowledged that at the time he felt that when you "tell the truth, people usually —I don't know—they look upon you as though—well, he deserves a break or something of that sort." That part of the accused's testimony which relates directly to the ground of his objection is as follows:

"Q. In the course of your being interrogated by Chief WILLIAMS at the Security Office at the South Gate of the Naval Air Station, did Chief WILLIAMS make the statement to you that he knew all about your telephone call to this Wave at Mainside?
A. Yes, sir.

• • • • •

"Q. Did Chief WILLIAMS' intimation or his saying that he knew all about your phone call to this Wave at Mainside influence you in any way as to whether or not you would make a statement? Did you feel that because he said he knew all about this call to the Wave at Mainside, that you were compelled or had to make a statement regarding other telephone calls?
A. Yes, sir, the way he put it to me, it sounded as though I had to make a statement.
"Q. You didn't feel that you had the option of making a statement or remaining silent?
A. No, sir.
"Q. When he asked WEIGLE to leave

the room where you were being interrogated, did you feel that he was trying to put you at ease and to make it easier for you to make a statement?

A. Yes, sir."

The quoted part of the accused's testimony, as distinguished from that of his counsel, can be construed to mean that he was coerced into making the confession, not because he believed that it was required by his prior admission that he had telephoned a Wave, but because Chief Williams made it appear that he had to talk. However, construing the testimony as a claim that the one statement influenced the making of the other, there is still an abundance of evidence from which the President of the court-martial and the court members could find that the confession was voluntarily made. Between the time of the first admission and the confession, the accused was informed on three separate occasions that he did not have to make any statement. On the first warning he evidenced his freedom from any possible adverse influence resulting from his initial remarks by denying that he made the telephone calls. On the second occasion he was left to himself and he wrote the statement in his own hand after hearing and acknowledging that he understood his rights under Article 31 of the Uniform Code, 10 USC § 831. Moreover, in his testimony the accused admits that he believed that by confessing "people" might think that he deserved "a break or something of that sort."

Other parts of the testimony set out also point in the direction of complete freedom of choice on the part of the accused. We need not restate them. Suffice it to say that, in our opinion, the evidence is in the aggregate legally sufficient to support a conclusion that the first statement by the accused did not cause him to make the second, and that he possessed the mental freedom to choose deliberately between making a statement or refusing to make one. United States v Dutcher, 7 USCMA 439, 22 CMR 229, opinions Chief Judge Quinn and Judge Ferguson.

We answer the certified question by holding that the evidence is legally sufficient to support the court-martial's conclusion that the accused's confession was voluntary and uninfluenced by his prior admission. However, the board of review can reweigh the evidence and judge the credibility of the witnesses. We have not marshalled all the evidence which might justify the board of review in reaching a contrary conclusion as a question of fact. We prefer not to attempt to anticipate its action by searching the record at this time to determine if there is sufficient evidence to support a finding that the confession is involuntary. United States v Moreno, supra.

The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Navy for resubmission to the board of review for reconsideration of the case on the merits.

FERGUSON, Judge (concurring):

I agree with the majority view that the question when dealing with the admission of confessions in evidence is always voluntariness. As we said in United States v Dutcher, 7 USCMA 439, 22 CMR 229, and I reiterated in United States v Green, 7 USCMA 539, 23 CMR 3, when we speak of "tainting" in connection with the admission of confessions in evidence, a qualitative analysis of the circumstances must be made to determine if the circumstances surrounding the first statement rendered the questioned statement involuntary and hence inadmissible. This is to be distinguished from the "tainting" of evidence through illegal search and seizure where it must merely be shown that the evidence objected to is the product of the evidence that was illegally obtained. Silverthorne Lumber Co. v United States, 251 US 385, 40 S Ct 182, 64 L ed 319; paragraph 152, Manual for Courts-Martial, United States, 1951. In the instant case, even if the second confession was obtained through information supplied by a prior statement, it must appear that the second

115

statement was involuntarily obtained. It is not enough to show merely a connection between the two. It is not always impossible to "rebag" the cat.

Judge LATIMER concurs in the result.