**UNITED STATES**

v.

**Airman First Class Donald E. BOWLES,
FR 563–25–3557 United States
Air Force.**

**ACM S24648.**

U. S. Air Force Court of Military Review.

Sentence Adjudged 13 July 1978.

Decided 26 April 1979.

Appellate Counsel for the Accused: Colonel B. Ellis Phillips, Captain Robert G. Gibson, Jr., and Major Marc G. Denkinger, USAFR. Captain George W. Denninghoff filed a brief on behalf of the accused.

Appellate Counsel for the United States: Colonel Julius C. Ullerich, Jr., and Lieutenant Colonel Merton F. Filkins.

Before EARLY, HERMAN, ORSER and ARROWOOD, Appellate Military Judges.

DECISION

HERMAN, Judge:

The essential questions in this case turn on procedures used in a random gate search conducted at Malmstrom Air Force Base, Montana, the standing of the accused to contest the search, and the resultant admissibility of marihuana seized from a government issue flight bag and other drugs found after apprehension of the accused. A military judge sitting as a special court-martial convicted the accused, despite his pleas, of three drug possession offenses in violation of Articles 92 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892, 934. In

addition, the accused pleaded guilty and was convicted of failing to obey a written order of his commander prohibiting him from driving a motor vehicle on base. The approved sentence is a bad conduct discharge, confinement at hard labor for four months and reduction to airman basic; confinement in excess of 40 days was remitted by the convening authority.

On 19 April 1978, random vehicle inspections were being conducted at the main gate of Malmstrom Air Force Base, in accordance with a local security police operating instruction.[1] After six or more vehicles had been inspected, a government six passenger crew cab truck returning from a missile complex, was selected for inspection. After the occupants, including the accused, had alighted, a trained drug detection dog was led through the vehicle and alerted on two flight bags in the rear of the truck. These bags were issued to vehicle occupants for their use in carrying personal and government issue items to work sites.

Both bags were taken from the truck, and the occupants asked to acknowledge ownership.[2] After the contents of the first bag had been examined revealing no contraband, and the accused had admitted ownership of the second bag, it was opened by the security policeman who discovered within a plastic bag of marihuana, the subject of Charge II. The accused was then placed under apprehension, advised of his rights, and escorted to the security police visitor control building. He was asked to stand by a wall, but he sat down on a couch instead; when he arose, he removed his hands from his pockets and a small vial fell from his pocket. Upon examination, the tablets within were determined to contain oxycodone and lysergic acid dythylamide (LSD), and were made the subject of the specifications of Charge I.

1. That instruction provided, in pertinent part:
2. PROCEDURES: Inspections will be conducted at base entrance gates in a manner to preclude interference with the flow of traffic. Inspections will be conducted on vehicles entering and leaving the base. These inspections must be supervised by the Shift Supervisor or Flight Chief.
   a. Frequency.

   . . . . .

   (2) Random Vehicle Inspections. As a minimum, a random vehicle inspection will be conducted once each shift. The Shift Supervisor will direct the time, place and duration of the inspection.

   . . . . .

   c. Selection. Vehicles to be inspected will be selected on an impersonal basis. The first vehicle to be inspected will be the fifth vehicle to enter the base after the official start of the inspection. Thereafter, every fifth vehicle to enter or depart the base at the conclusion of the previous inspection will be inspected.

   . . . . .

   e. Military Working Dog Teams. Military Working Dog Teams will be utilized when available to perform Law Enforcement duties or on the specific request of the Shift Supervisor. A Military Working Dog Team may participate in vehicle inspections.

   . . . . .

   g. Method of conducting the inspection. A simple, rather than a complete search will be conducted. Remember, this is not a search but an INSPECTION. We are not looking for any specific item but any given number of contraband items. The security police inspection person will check the trunk, back seat, front seat, under the seat and any compartment or item which could contain contraband.

   (1) Contraband. Whenever contraband has been detected, the inspection will cease immediately. The vehicle occupants will be apprehended based on probable cause and advised of their rights in accordance with Article 31, UCMJ, 10 U.S.C.A. § 831, or the fifth amendment, as appropriate. The Shift Supervisor will be notified. A search incident to apprehension will be restricted to the person apprehended. When outside a vehicle, this search will include the suspect's immediate area. A consent for search and seizure will be requested from the owner.

   (2) Whenever a consent for search is not authorized or the vehicle owner cannot be located, a conference call will be established between the Shift Supervisor, On-Call Legal Representative and the Installation Commander. The Installation Commander will dictate whether probable cause is sufficient to pursue the search. If approved by the Installation Commander, a complete vehicle search will be conducted.

2. In the light of our disposition of the search issue, we do not find it necessary to discuss the implications arising from the lack of advice under Article 31 and the right to counsel prior to the request to identify their bags.

■ The initial question before us is whether the accused had standing to contest the search of the government issue flight bag. We find that he did. One who seeks to suppress evidence must show that his Fourth Amendment rights have been infringed by the search and seizure which he seeks to challenge. *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). His expectation of privacy is not limited to his home, office, hotel room, or even a telephone booth, for, "[w]herever a man may be, he is entitled to know that he will remain free from unreasonable searches and seizures." *Katz v. United States,* 389 U.S. 347, 359, 88 S.Ct. 507, 515, 19 L.Ed.2d 576 (1967). See also, *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

Military courts have held that one may reasonably expect privacy in the base of a venetian blind in a dormitory room, *United States v. Rosado,* 2 M.J. 763 (A.C.M.R.1976); and in a personal shaving kit carried aboard a government aircraft, *United States v. Dingwell,* 1 M.J. 594 (A.C.M.R.1975). They have held no reasonable expectation of privacy in a government desk used in performance of official duty, *United States v. Weshenfelder,* 20 U.S.C.M.A. 416, 43 C.M.R. 256 (1971), *United States v. Taylor,* 5 M.J. 669 (A.C.M.R.1978); or in a government briefcase issued for personal use to a court reporter *where it was common practice for fellow workers to look through the work area and briefcases,* to find records of trial. *United States v. McClelland,* 49 C.M.R. 557 (A.C.M.R.1974). In *United States v. Simmons,* 22 U.S.C.M.A. 288, 46 C.M.R. 288 (1973), in which the question was the expectation of privacy in an emergency gasoline can attached to a military truck, it was held:

> [T]he gasoline can attached to the vehicle, the property of the Government, was not made available to appellant for his per-

sonal use so as to provide him an expectation of privacy from governmental intrusion so that he has standing to object to its search . . .

. . . . .

When dealing with government clothing and equipment issued to the individual soldier for his personal use, the constitutional right to privacy in the property granted is nearly complete. The right to entry retained by the Government is the power to inspect such property to insure the safety and security of a unit or to determine the soldier's readiness properly to perform his duties.

*Id.* at 293.

■ The flight bag was issued to the accused for his individual use in carrying government issue items, such as cold weather gear, as well as personal clothing and toiletries. Unlike the desk and briefcase in the *Weshenfelder, Taylor* and *McClelland* cases, *supra,* it was not common practice for supervisors or co-workers to look through the flight bag as a matter of course.[3] Under these circumstances, it was eminently reasonable for the accused to harbor an expectation of privacy in the bag; thus, we find he had standing to contest a search thereof.

We must next examine the propriety of the gate search in the light of the Court of Military Appeals' pronouncement in *United States v. Harris,* 5 M.J. 44, 65 (C.M.A.1978), that "a procedure must be employed which completely removes the exercise of discretion from persons engaged in law enforcement activities." Although that decision distinguished the facts of *United States v. Blade,* 49 C.M.R. 646 (A.F.C.M.R.1975), *pet. denied,* 23 U.S.C.M.A. 663, 50 C.M.R. 903 (1975), its similarity to this case causes us to rely upon some of its rationale. In *Blade,* the Chief of Security Police ordered a search of all vehicles entering or leaving

---

3. The accused was, by local regulation and custom of the service, subject to inspection at guardmount for a determination of whether he had the proper items of clothing and equipment to perform his duties. However, he testified that his flight bag had never, in fact, been inspected. The stipulated testimony of another airman was before the court as well; it indicated that his bag had never been inspected either, but that drug detection dogs had been walked past the bags at guardmount.

through base gates during a particular two hour period. The searches were ordered under a Strategic Air Command regulation requiring that a no-notice search of this nature be conducted at least monthly. Marihuana was found in the trunk of Airman Blade's vehicle during the course of the vehicle search. In upholding the conviction, Senior Judge Roberts wrote:

> The inherent authority of the commander to inspect obviously conflicts with the Constitutional right of the serviceman to be free from unwarranted searches of his person or property. However, the Fourth Amendment does not prohibit all searches, but only such searches as are unreasonable. . . .
> The purpose of the exclusionary rule is to deter misconduct by policemen or law enforcement officials.

.    .    .    .    .

> The principles discussed in [*Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)] with respect to the "stop and frisk" apply with equal force to the routine gateway search. As we noted above, it too is limited in time, place, scope, and intensity. The interest of the Nation in its defense installations is of the highest order, and has been described by the Supreme Court as being "essential and obvious." [Citations omitted.]

*Id.* at 648–649.

In the case before us, a more recent Strategic Air Command regulation provided that the base commander approve a detailed operating instruction to govern the conduct of random inspections, after its review by his staff judge advocate (see footnote 1). It further required that a minimum of five vehicles be inspected each shift, and that the times be varied and supervised by a commissioned or non-commissioned officer.[4] A stipulation of fact in this case indicates that a security police officer directed the time, place and duration of this inspection, as authorized by the Base Commander in the operating instruction. The officer and the flight chief, a Technical

Sergeant, were present to supervise the inspections. Trial defense counsel alleges that the *Harris* case, *supra*, prohibits the delegation of discretion to security police personnel. There it was held:

> To insure the least possible intrusion into the constitutionally protected area, and thereby preserve freedom from unreasonable invasions of personal privacy, a procedure must be employed which completely removes the exercise of discretion from persons engaged in law enforcement activities. This contemplates independent determination of times when the searches will be conducted, the method of selecting the vehicles to be stopped, the location of the operation, and the procedure to be followed in the event something is discovered.

5 M.J. 44, 65. The pertinent footnote to that text reads,

> It may be feasible or desirable for the commander to delegate the function of actually selecting vehicles to an officer who is neutral in outlook and has no connection with law enforcement activities. [The] officer could be given absolute discretion to make these selections on the scene, so long as he makes a completely independent decision without advice or suggestions from law enforcement officials. The presence of an officer during implementation of the procedure will place the stamp of authority on the activity and persons approaching the gate will have no cause for alarm or annoyance.

*Id.* at footnote 30.

█ The concern of the Court of Military Appeals, as evidenced from the foregoing passages, is that the exercise of discretion to select particular cars for inspection is divorced from the law enforcement function. Under the random selection procedure used in this case, i. e., every fifth vehicle, the danger of abuse of law enforcement discretion is practically nonexistent. By regulation, the base commander directed the method of selecting vehicles for inspec-

---

4. Paragraph 3–4d (Added), Strategic Air Command Supplement 1, dated 19 October 1977 to

Air Force Regulation 125–37, Protection of USAF Resources, dated 21 December 1973.

tion and that such random inspection be conducted each shift. As it is unreasonable to assume that he must direct the time, place and duration of the inspection for each shift, in the same regulation he delegated these decisions to the shift supervisor, in this case a law enforcement Lieutenant.

If the terms of the regulation are followed, there is virtually no danger that any particular car or suspect will be singled out for inspection. Thus, the fact that the officer directing the time, place and duration of the inspection is a law enforcement supervisor does not disqualify him from performing that function; he does not, in fact, select particular vehicles for inspection, but simply initiates the procedure by which the gate guard commences to select each fifth vehicle thenceforth. The guard makes the non-discretionary selection by simple count.[5] We therefore find the system of random inspection contemplated by the operating instruction to satisfy constitutional requirements for propriety of gate searches.

We agree, however, with the averment of trial defense counsel in his excellent brief submitted under Article 38(c), Code, 10 U.S. C.A. § 838(c), *supra*, that the gate guard's failure to follow these procedures resulted in the unlawful seizure of marihuana from the flight bag. We do not rely on the proposition posed that the search was flawed by a failure of the government to follow its own regulations to the detriment of personal rights or liberties,[6] but rather on the broader proposition that the search failed to satisfy Fourth Amendment standards.

■ The accused was neither requested nor did he grant consent to search the flight bag. *Davis v. United States*, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946); *United States v. Rushing*, 17 U.S.C.M.A. 298, 38

C.M.R. 96 (1967). As the accused had not yet been apprehended, the search could not be justified as incident thereto;[7] and since the flight bag was under the control of the security policeman, there can be no claim of exigent circumstances requiring immediate search without authority. *United States v. Martin*, 183 U.S.App.D.C. 154, 562 F.2d 673 (1977); *United States v. Kinane*, 1 M.J. 309 (C.M.A.1976). Thus, we are left with the alternative of securing authority to search from the base commander. We recognize that probable cause could well have been established to search the flight bag as a result of the dog's alert thereon, *United States v. Grosskreutz*, 5 M.J. 344 (C.M.A. 1978), *United States v. Unrue*, 22 U.S.C. M.A. 466, 47 C.M.R. 556 (1973). However, the gate guard failed to initiate procedures for the conference call to the base commander and staff judge advocate which could have secured the appropriate authority for further search.[8] Without such authority, the search of the bag was unlawful and the seizure of marihuana tainted. Therefore, Charge II must fail for want of lawfully obtained evidence. *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *United States v. Thomas*, 1 M.J. 397 (C.M.A.1976).

■ We must next consider the effect of the tainted evidence upon Charge I, and its specifications, possession of LSD and oxycodone. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Ordinarily, evidence obtained as a direct result of an earlier, unlawful intrusion is barred from admission at trial. "[W]here evidence has been obtained by exploitation of an unlawful search, the Government must affirmatively establish that the evidence was *in fact* discovered by a means

5. See *United States v. Harris*, 5 M.J. 44 (C.M.A. 1978), at 64: "Particularly, the absence therein of any degree of discretion on the part of the guards is significant."

6. *United States v. Russo*, 1 M.J. 134 (C.M.A. 1975), and cases cited therein.

7. Even had the apprehension taken place, the search could not be upheld as the flight bag

was already under the dominion of the security policeman and was outside the immediate vicinity of the accused. *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *United States v. Dutcher*, 7 U.S.C.M.A. 439, 22 C.M.R. 229 (1956).

8. *United States v. Ezell*, 6 M.J. 307 (C.M.A. 1979); *supra*, note 1, paragraph 2g(2).

independent of the illegality. It is not enough that it *could have been* so discovered." *United States v. Peurifoy*, 22 U.S.C. M.A. 549, 552, 48 C.M.R. 34, 37 (1973); Manual for Courts-Martial, 1969 (Rev.), paragraph 152; see also *United States v. Moore*, 19 U.S.C.M.A. 586, 42 C.M.R. 188 (1970). The focus of the issue before us, therefore, is whether the accused's post-arrest abandonment of the LSD and oxycodone was caused by the illegal entry into his flight bag. We hold that it was not.

 We have decided that the random search of the government vehicle in which the accused was riding was lawful, and that the drug detection dog's alert upon two flight bags provided probable cause to search, albeit with the authority of the base commander. The same circumstances provided probable cause to apprehend all of the occupants of the vehicle. *United States v. Unrue*, 46 C.M.R. 882 (A.C.M.R.1972), *aff'd*, 22 U.S.C.M.A. 466, 47 C.M.R. 556 (1973). The probable cause to apprehend was not lost by virtue of the illegal search of the flight bag by the security policeman, but continued until he did, in fact, apprehend the accused. After he was advised of his rights and was taken to the visitor control building, the accused was seen to drop the vial containing the drugs. We find the security police seizure of this abandoned property lawful,[9] as the connection between the discovery of marihuana in the flight bag [10] and the seizure of the vial was so attenuated by the independent factors of lawful arrest, advice of rights, and voluntary abandonment of the vial as to dissipate the taint of the unlawful search. *United States v. Waller*, 3 M.J. 32 (C.M.A.1977); *United States v. Boisvert*, 1 M.J. 817 (A.F.C. M.R.1976), *pet. denied* 5 M.J. 1055 (C.M.A. 1976).

The remaining errors assigned by trial defense counsel are mooted by our action or are without merit. Reassessing the sentence in the light of our dismissal of Charge

II and its specification and the remission of confinement in excess of 40 days by the convening authority, we find it nevertheless appropriate for the remaining offenses. The findings of guilty of Charge II and its specification are set aside and ordered dismissed. The remaining findings of guilty and the sentence are correct in law and fact and, on the basis of the entire record, are

AFFIRMED.

EARLY, Chief Judge, ORSER and ARROWOOD, Judges, concur.

---

**9.** "[A] lawful arrest does not in itself amount to such *compulsion as will render* an otherwise voluntary abandonment involuntary." *United States v. Maryland*, 479 F.2d 566, 568 (5th Cir. 1973).

**10.** As well as any illegality which may have resulted from the lack of Article 31 advice prior to the accused's identification of the bag.