UNITED STATES

v.

**Specialist Four (E–4) Carl D. DINGWELL, 385–50–0157, US Army, Medical Holding Company, US Army Ireland Army Hospital, US Army MEDDAC Fort Knox, Fort Knox, Kentucky.**

CM 431946.*

U. S. Army Court of Military Review.

30 July 1975.

* Consult Table of Cases in Bound Volume by Name of Accused for appellate history.

Appellate counsel for the Accused: CPT Paul C. Hemmer, JAGC; MAJ James Kucera, JAGC; LTC Edward S. Adamkewicz, Jr., JAGC; COL Victor A. De Fiori, JAGC.

Appellate counsel for the United States; CPT William A. McNutt, JAGC; CPT Joel M. Martel, JAGC; LTC Ronald M. Holdaway, JAGC.

## OPINION OF THE COURT

O'DONNELL, Judge:

Contrary to his pleas, the appellant was convicted of wrongfully possessing heroin in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. He was sentenced to be discharged from the service with a bad-conduct discharge, to forfeit all pay and allowances, and to be confined at hard labor for six months. The convening authority approved the sentence as adjudged.

The appellant contends before us, as he did at trial, that the heroin was the subject of an illegal search and seizure and therefore inadmissible. The military judge denied the defense motion to suppress evidence of the heroin, holding that the search was legal on the basis of military necessity. We reverse.

On 25 October 1973, the appellant boarded an Air Force medical evacuation flight at the Louisville airport. The flight originated at Scott Air Force Base, Illinois, with a scheduled destination of Detroit, Michigan, with intermediate stops at Wright-Patterson Air Force Base, Ohio; Louisville, Kentucky; and Fort Campbell, Kentucky. The ultimate destination of the appellant, who was a drug addict, was the Veterans' Administration hospital in Detroit.

Staff Sergeant David Shorb, United States Air Force, was the senior enlisted medical attendant for the flight. Sometime during the flight from Louisville to Fort Campbell, Sergeant Shorb observed the appellant go into the latrine, carrying his shaving kit and remain there for 15–20 minutes. Sergeant Shorb felt this was unusual and testified that he had never before seen anybody enter a latrine on board a military aircraft carrying a shaving kit. Sometime later, as the "Fasten Seat Belt" sign came on preliminary to the airplane's landing at Fort Campbell, Sergeant Shorb noticed the appellant light up a cigarette and share it with the passenger in the seat next to him. Sergeant Shorb found this behavior to be suspicious. His suspicions were heightened when, about a minute and a half after he first observed the appellant smoking, he detected a sweet odor which he believed to be marijuana. Although Sergeant Shorb testified that he had never attended any course dealing with drug detection, he had smelled marijuana at rock concerts.

At this point, Sergeant Shorb called his supervisor, First Lieutenant Paula Sturgeon, United States Air Force, on the intercom, and told her that he suspected the appellant "probably has some kind of drug, because it smells that way." As the aircraft was then beginning its descent for the Fort Campbell landing, Sergeant Shorb indicated that he would talk to Lieutenant Sturgeon after landing. When the plane landed, he went directly to Lieutenant Sturgeon, informed her of his previous observations, and told her he suspected the appellant of smoking marijuana.

Lieutenant Sturgeon was the medical crew director on board the flight. In her testimony she corroborated Sergeant Shorb's testimony in substantial detail concerning the information relayed to her about the appellant's activities. After receiving the information from Sergeant Shorb, Lieutenant Sturgeon, according to her testimony, went to the aircraft commander, First Lieutenant Thomas McCoy, and reported to him exactly what Sergeant Shorb had told her. Lieutenant Sturgeon stated that she did not personally know Sergeant Shorb but she considered him to be reliable in the performance of his duties as a medical flight attendant. As to Ser-

geant Shorb's reliability in being able to detect the odor of marijuana, Lieutenant Sturgeon stated that she "had no reason to question him," so she didn't. Finally, Lieutenant Sturgeon testified that she herself did not smell marijuana on the flight, although she had undergone training in the detection of marijuana odors. Her seat on the aircraft, however, was located at some distance from that of the appellant.

Lieutenant McCoy, United States Air Force, the aircraft commander, also testified. He stated essentially that when the aircraft landed at Fort Campbell, Lieutenant Sturgeon informed him that Sergeant Shorb suspected two passengers in the back of the aircraft of smoking marijuana. The conversation with Lieutenant Sturgeon took 10–15 seconds. Lieutenant McCoy first directed that none of the passengers leave the aircraft and then proceeded to Flight Operations at Fort Campbell where he telephoned his home base for guidance. Following the call, he notified the military police at Fort Campbell, informed them that he suspected two persons of smoking marijuana, and requested that they be searched by the military policemen.[1] The search was conducted but no contraband was discovered.[2]

Lieutenant McCoy also directed that a search be conducted of that area of the aircraft occupied by the persons who were searched. As a result of this search, which was conducted by the aircraft personnel, a shaving kit was discovered by Sergeant Shorb in the pocket located on the rear of the seat in front of the seat occupied by the appellant. The shaving kit was opened, revealing, among other personal items, a pair of sandals, one of which was torn. Located in the opening was a small packet containing a white powder. A laboratory analysis determined the powder to be heroin.

Two primary issues are presented for our consideration—standing and the legality of the search.

## I—STANDING

The Government first contends that the appellant lacked standing to contest the legality of the search. The Government's position is essentially twofold: (1) As the appellant did not testify on the motion to suppress, he has not established by testimony or otherwise that he had a possessory interest in the thing seized; (2) The appellant has no standing to object to a search of a Government aircraft.

■ It is well-recognized that to contest the legality of a search, a person must have standing, i. e., he must be the person aggrieved by the purportedly unlawful search. *See Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). The Supreme Court provided in *Jones* that a person has automatic standing in those cases, such as the instant one, where possession of the thing seized is an essential element of the crime. *Id.* at 264, 80 S.Ct. 725. *Jones* also provided that a person has standing to contest the validity of a search when he is legitimately on the premises at the time of the search. 362 U.S. at 265, 80 S.Ct. 725.

The Government's position in the instant case is that the Supreme Court in *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), abandoned the concept of automatic standing and that in any event the *Jones* rationale is inapplicable to a search of military property. We reject

1. Lieutenant McCoy's testimony is somewhat at odds with that of Lieutenant Sturgeon. Lieutenant McCoy initially stated several times that during the 10–15 second conversation, Lieutenant Sturgeon merely informed him that Sergeant Shorb suspected the appellant of smoking marijuana. On cross-examination, however, Lieutenant McCoy stated that he may have been informed by Lieutenant Sturgeon that Sergeant Shorb had smelled the marijuana.

2. Actually, five persons were searched. These persons were selected by Lieutenant Sturgeon. Selection appears to have been based on several factors. Four of the patients, including the appellant, were drug abuse patients. Four of the patients had boarded the plane at Louisville, the other had boarded at Scott Air Force Base, but was seated near the drug abuse patients. The nondrug-abuse patient had a diagnosis of paranoid schizophrenia.

the Government's argument that *Simmons* effectively overruled *Jones*. *See Brown v. United States*, 411 U.S. 223, 228, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1972); *United States v. Simmons*, 22 U.S.C.M.A. 288, 291, 46 C.M.R. 288, 291 (1973) at footnote 5.

The Court of Military Appeals has also addressed the question of standing to contest the validity of a search. In *United States v. Aloyian*, 16 U.S.C.M.A. 333, 36 C.M.R. 489 (1966), Chief Judge Quinn, speaking for the Court, held that the accused had no standing to contest the legality of a search of another person's locker where the evidence established that the accused had no permission, express or implied, to use the locker. Chief Judge Quinn concluded that as the accused was not lawfully using the locker, neither aspect of the *Jones* rule applied. Judge Kilday, concurring in the result, concluded that *Jones* did not apply because a locker cannot be equated to "premises" within the meaning of *Jones*. Judge Ferguson dissented. He would hold that as the accused was charged with a possessory offense (marijuana), he had automatic standing under the first aspect of *Jones*. As to the second aspect, Judge Ferguson found that the accused had permission to use the other's locker and therefore had standing on this ground as well.

The Government in the case *sub judice* relies principally on the Court of Military Appeals decision in *United States v. Simmons, supra*. In that case, the accused was a passenger in a military jeep which was searched by military personnel. A sock containing heroin was found in a gasoline can attached to the rear of the vehicle. The Army Court of Military Review held that the accused had no standing to contest the search because of its finding that the jeep had been wrongfully appropriated. Judge Duncan, writing for the Court, disagreed with this conclusion of the Court of Military Review. Judge Duncan found that the evidence was insufficient to support a conclusion that the accused had wrongfully appropriated the jeep. Accordingly, Judge Duncan concluded:

"Combining the fact that the appellant was charged with a possessory crime and the fact that his *presence* as a passenger in the vehicle was not shown to be other than legitimate, the first *Jones* concept (alleged possession of contraband creates standing without requiring avowal of ownership) as well as the second thrust of that decision (legitimacy of presence) leads me to disagree with the Court of Military Review that Simmons lacked standing to object to the search because of a wrongful appropriation of the vehicle." 22 U.S.C.M.A. at 292, 46 C.M.R. at 292.

Judge Duncan, however, did conclude that the accused in *Simmons* lacked standing because he did not have an expectation of privacy from governmental intrusion into the gasoline can, citing *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1971). Chief Judge Darden concurred in the result on the theory that a passenger in a military vehicle has no right of privacy which would give him standing to contest a search of the vehicle. Judge Quinn also concurred in the results, apparently because he believed the search to be legal as a search of military property.

▮ As the offense in the instant case is a possessory crime and as the appellant's shaving kit was legitimately on the premises, the appellant had standing to contest the legality of the search so long as he had an expectation of privacy in the property searched. *Simmons, supra*. The search of the shaving kit was a search of private property, not government property. The appellant boarded the aircraft with his shaving kit and kept it in a portion of the aircraft commonly used for such purposes. Under the circumstances, we are satisfied that he had an expectation of privacy with respect to the shaving kit and that this expectation of privacy was never relinquished. Accordingly, the appellant had standing to contest the legality of the search of the kit.[3]

---

3. The appellant, however, had no standing to contest the legality of the search of those portions of the aircraft as to which he had no expectation of privacy.

## II—LEGALITY OF THE SEARCH

■ The military judge held that there was no probable cause to support the search but that the search was valid on the basis of military necessity. The judge apparently based his decision as to probable cause on the paucity of information available to Lieutenant McCoy as to the reliability of Sergeant Shorb. Notwithstanding the rule in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964),[4] there is no question as to Sergeant Shorb's reliability, as he was an eyewitness whose reliability may be presumed.[5] However, the information relayed from Sergeant Shorb through Lieutenant Sturgeon to Lieutenant McCoy did not rise to the level of probable cause. Even if we accept Lieutenant McCoy's modified version that Lieutenant Sturgeon advised him that Sergeant Shorb detected the odor of marijuana, the result would be the same, as Lieutenant McCoy was not advised as to Sergeant Shorb's expertise in matters olfactory. *Cf., United States v. Smallwood*, 22 U.S.C.M.A. 40, 46 C.M.R. 40 (1972).

The Government, however, contends that the judge properly admitted the disputed evidence on the basis of military necessity. As the Court of Military Appeals noted in *United States v. Unrue*, 22 U.S.C.M.A. 466, 469, 47 C.M.R. 556, 559 (1973), the rubric "military necessity" is "only another way of saying that the Government's action was, in the circumstances, reasonable."

■ The Court has consistently recognized that the Fourth Amendment does not prohibit all searches and seizures but only those unreasonable intrusions into a person's privacy. *See e. g., United States v. Kasmierczak*, 16 U.S.C.M.A. 594, 37 C.M.R. 214 (1967); *United States v. Maglito*, 20 U.S.C.M.A. 450, 43 C.M.R. 296 (1971); *United States v. Torres*, 22 U.S.C.M.A. 96, 46 C.M.R. 96 (1973); *United States v. Poundstone*, 22 U.S.C.M.A. 277, 46 C.M.R. 277 (1973). The common thread running through all of these decisions is the concept that the record must establish a factual basis for the conclusion that the intrusion in question was reasonable. Thus, in *Unrue*, the record established, at least to the satisfaction of two of the judges, that the drug problem at Fort Benning, Georgia, was of such magnitude as to pose a "serious threat to the morale, capability and health" of the members of the command. 22 U.S.C.M.A. at 469, 47 C.M.R. at 559. The Court held that the inspection system devised to keep drugs out of the command was a legitimate regulatory program under the circumstances and that the means selected to implement the program were as " 'carefully limited in time, place and scope' as the purpose of the system required and the effectiveness of the system necessitated." 22 U.S.C.M.A. at 470, 47 C.M.R. at 560. In short, the Court found the inspection in *Unrue* to be reasonable under the circumstances.[6]

*See also United States v. Buchanan*, 49 C.M.R. 620 (A.C.M.R.1974).

4. The Supreme Court in *Aguilar* held that an affidavit in support of a search warrant may be based on hearsay information received from an informant and need not reflect the personal observation of the person seeking the warrant. In such a case, however,

"the magistrate must be informed of [1] some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were and [2] some of the underlying circumstances from which the officer [requesting the search warrant] concluded that the informant, whose identity need not be disclosed, . . . was 'credible' or his information 'reliable'." 378 U.S. at 114, 84 S.Ct. at 1514. The second prong of *Aguilar*, relating to the honesty of the informant, is generally referred to as the "reliability" of the informant and is so used herein. *See* Gilligan, *Probable Cause and the Informer*, 60 Military Law Review 1 (1973).

5. For the proposition that a "citizen informant" who purports to be a victim or a witness to a crime may be considered reliable even though his reliability has not been previously tested, *see United States v. Bell*, 457 F.2d 1231 (5th Cir. 1972); *Pendergrast v. United States*, 135 U.S.App.D.C. 20, 416 F.2d 776 (1969); *Brown v. United States*, 125 U.S.App.D.C. 43, 365 F.2d 976 (1966); *State v. Paszek*, 50 Wis.2d 619, 184 N.W.2d 836 (1971); *United States v. Herberg*, 15 U.S.C.M.A. 247, 35 C.M.R. 219 (1965).

6. The Court in *Unrue* held that there were two aspects of military necessity or reasonableness relevant to the case: (1) a search to protect the security of the command and (2) an administrative inspection to effectuate a proper military regulatory program. *Cf. United States v.*

In the instant case, as already noted, the prosecution's theory was that the search was justified on the basis of probable cause. Accordingly, the evidence developed on the suppression motion tended to focus on whether there was sufficient evidence to establish that the appellant was in possession of marijuana and whether there was sufficient information available to Lieutenant McCoy to establish the informant's reliability and the trustworthiness of his information. The evidence developed by the prosecution did not extend to the question of the security of the aircraft. This point was first raised by the military judge in his questioning of the aircraft commander.

■ Thus, the following colloquy took place during the initial questioning of Lieutenant McCoy by the military judge:

"Q: Well, let me ask you this question. When you were informed of there being a possibility that someone was using marijuana on your aircraft, was there any reactions you took—would have taken because of any influence for the safety of the people of the aircraft itself?

A: Well, the action I took was the fact that I wanted these people searched to make sure there were no drugs on the aircraft, or if there were, to have them removed.

Q: Why?

A: Because, although, I am not a medical authority, I don't know what a person's reaction would be to a drug at certain cabinet altitudes above sea level, and I am not going to endanger my aircraft to have some guy possibly try to take control of that aircraft through forceful means and endanger the crew and the passengers on board."

After the prosecution had presented its evidence on the motion and both counsel had

argued, the military judge recalled Lieutenant McCoy with the following results:

"Q: Lieutenant McCoy, yesterday when I asked you about the effect of personnel in your plane, who may have been under the influence of intoxicants or drugs, which were not prescribed, you mentioned that there would be, if I recall your testimony correctly, you mentioned it would be a threat to your plane?

A: I didn't say that. I don't know if I said there would be a threat, I said it is a possibility of—

Q: Now, what if any part did that consideration play in your decision to have the airplane searched?

A: It played a large part in my decision, just as any other unusual occurrence on my aircraft." [7]

■ Although Lieutenant McCoy testified, after a fashion, that he directed the search because of a concern for the security of his aircraft, his conclusion in this regard was based solely on the information conveyed to him by Lieutenant Sturgeon. At best, this information showed that Sergeant Shorb suspected the appellant of smoking marijuana. We are not satisfied that the information given to Lieutenant McCoy established a reasonable basis for Lieutenant McCoy to conclude that the security of his aircraft or the safety of the passengers and crew was in jeopardy. There is nothing to indicate that the appellant or anyone else was dangerous to himself or others or was about to take over the aircraft. Certainly, there was no basis for Lieutenant McCoy to conclude that a marijuana smoker, as such, is prone to such activity.

Moreover, we believe that it is significant that Lieutenant McCoy's conclusion as to the security of the aircraft was based on

---

*Poundstone, supra.* In the instant case, there is no question of an administrative search pursuant to a regulatory program. The basis of the judge's ruling, as we will note, was a one-time search to safeguard the security of the aircraft.

7. The defense contends that the military judge, by his extended questioning of Lieutenant McCoy, abandoned his impartial role as a mag-

istrate and assumed the role of a prosecutor. Although we believe the judge would have been better advised to have directed the trial counsel to develop the concept of military necessity, we are satisfied that the judge's sole concern was to determine the basis for Lieutenant McCoy's action and that he did not abandon his impartial role.

the hearsay information relayed to him by Lieutenant Sturgeon. While we do not suggest that the *Aguilar* rule is binding in this area, we believe that the reasonableness of Lieutenant McCoy's actions must be based on the quantitative and qualitative nature of the information before him. We are not satisfied that the quantity and quality of the information presented to Lieutenant McCoy supports a finding of military necessity. Reversal is required.

The findings of guilty and the sentence are set aside and the charges are dismissed.

Senior Judge JONES and Judge VINET concur.