UNITED STATES

v.

Mark J. WHIPPLE, Electronics
Technician Second Class, U. S.
Coast Guard.  CGCMS 23360.

Docket No. 812.

U. S. Coast Guard Court of
Military Review.

Sentence Adjudged 18 Nov. 1976.

Decided 1 Feb. 1978.

Trial Counsel: LT Samuel E. Burton, USCGR.

Defense Counsel: LT Larry S. Craig, USCGR.

Appellate Defense Counsel: LT Frank E. Couper, USCG.

Appellate Government Counsel: LT Malcolm J. Williams, USCGR.

## OPINION

ROSENWASSER, Chief Judge:

Two days out of Callao, Peru, aboard the Coast Guard Cutter GLACIER, Petty Officer Whipple approached the drug exemption officer, CWO Hampton, and asked to speak with him privately. They went to the officer's stateroom; shortly after, the officer accompanied Whipple to another part of the ship, where Whipple handed over a plastic shopping bag containing what he said was cocaine in six smaller bags and a wax paper packet.

Three months later charges against Whipple were referred to the instant special court-martial for trial. The court, composed of a military judge and five members (two of them enlisted) found the accused guilty of wrongfully possessing 250 grams of cocaine at or near Lima, Peru, on or about 22 March 1976, and of wrongfully introducing the same aboard ship "for the purpose of transfer." Both offenses were specified under Article 134, UCMJ, 10 U.S.C. § 934.

The prosecution introduced in evidence the six baggies and the wax paper packet with the purported cocaine, the testimony of the drug exemption officer and the ship's executive officer relative to the accused's self-incriminating act, and the testimony of an intelligence officer who had come aboard the ship nine days later and, in four interviews with the accused, obtained his confession. The verdict against the accused rested on this evidence.

Prior to the introduction of this evidence, at a session of the trial without the presence of the members, the defense had moved to suppress the real evidence and to exclude the testimony of the three officers on the ground that the accused's verbal act

and later confession were not voluntary. After hearing extensive testimony, including that of the accused, the judge ruled that the evidence was admissible.

Among other issues, appellant asserts that the judge's ruling was incorrect; that the accused's admission and his confession were "obtained in violation of Article 31, UCMJ," and therefore should have been excluded from evidence. We agree with appellant, and upon this ground we reverse.

On the question of voluntariness, Chief Judge Quinn observed in an early case [1]:

> In every military confession, there must be two inquiries. First, was the accused properly warned, and second, was the confession obtained as a result of coercion, unlawful influence, or unlawful inducement? The confession must be excluded from evidence, according to the plain language of Article 31(d), if either of those proscriptions is violated

Whether the accused's verbal act and later confession were involuntary can be determined only by an examination of all the attendant circumstances. As to those circumstances, there is no substantial conflict in the testimony.

A shakedown search had been conducted aboard the GLACIER on the day the vessel left Peru. Its object was the discovery of drugs. The search uncovered some marihuana and one small bag of cocaine. Directly after the search, the crew (among them, the accused) was mustered on the flight deck. The executive officer spoke to them first; then the drug exemption officer, and then the executive officer again. According to his own testimony, the executive officer told the men that the search "had only scratched the surface"; and that "there must be a lot that we've overlooked"; he said that the search "gave me the opportunity . . . to let the drug exemption officer talk to them about the drug exemption program". With reference to what he said after the drug exemption officer's talk, he testified:

> I reminded them that if they came forward voluntarily, that they were subject to the drug exemption program . . . as outlined by Mr. Hampton. On the other hand, if they were found to be in violation of regulations before they stepped forward, then it was too late to use the program.

He explained further:

> I said that anyone who feels that they need the program should step forward and make it to their benefit.

Three petty officers who attended the muster testified as to their impressions of what the executive officer had said. Petty Officer Kendall stated:

> As clearly as I can recall, he made the statement that nothing would happen to you if you turned in whatever they were looking for, cocaine, I guess. And he said they knew it was aboard, they would find it, he said throw it over the ship (sic) or turn it in and nothing would happen to you.

Petty Officer DeCesare testified:

> He said that if you turned yourself in, that the program allowed immunity from prosecution, and that this was only if you were, you know, truly seeking help, that this program was worthwhile, and this would of course give you immunity from prosecution.
>
> Q. And that was by the executive officer?
>
> A. Yes. I won't quote him word for word, but this in fact is what I got out of it.

Petty Officer Sweaney testified:

> I can't really remember word for word, but I'm sure that it was around that, that you would be granted immunity.
>
> Q. Is that the clear impression you got?
>
> A. That was the impression I got.
>
> Q. And that impression was what?
>
> A. That you would be granted immunity if you came forward.

With regard to the talk given by the drug exemption officer, that officer's testimony included the following:

---

1. *United States v. Williams*, 2 U.S.C.M.A. 430, 432, 9 C.M.R. 60, 62 (1953).

Q. Do you recall anybody asking you would they be immune from possible prosecution as a result of . . .

A. No, sir. I did indicate strongly to them that they should come forward if they had a problem and discuss it with myself and let me know about the problem so we could help them. Because if they waited until they were caught with drugs in their possession or using them, that it would be disfavorable for them.

On cross-examination:

Q. Do you recall making it explicit that it was only for use and possession?

A. No. I didn't make it explicit and underline it. I just mentioned that the drug exemption instruction is for use and possession of drugs.

Q. Did you also really say that it was available to those who had a drug problem?

A. Yes.

Petty Officer Whipple "stepped forward" before it was "too late to use the program;" he did not "wait until he was caught with drugs in his possession." He went to the drug exemption officer as officially advised, and to that particular officer he gave up his cache of cocaine. In the following self-serving, but not incredible, testimony, he told why he did what he did:

Q. Were you influenced at all by the comments of the executive officer on the fantail at the time of the search?

A. Yes, I was.

* * * * * *

Q. Did you think about it very thoroughly?

A. Yes, I did.

Q. What did you decide to do?

A. I decided to turn my contraband over to the drug exemption officer in compliance with the command's request.

Q. And what did you understand would occur if you did that in regards to prosecution?

A. That I would be counselled and admitted to the drug exemption program.

Q. The question was, what did you understand as to prosecution?

A. That I would not be prosecuted.

Q. Very well. What was your desire in regards to the rehabilitation aspect of that?

A. Well, I did have a drug problem at the time, I wanted to be rehabilitated from my drug use.

Cross-examination elicited the following:

Q. What was the primary motive for your coming forward in this procedure?

A. I had many reasons that were interrelated and probably of equal validity and weight. I had guilt feelings, I had fear, my use was becoming very heavy. I was afraid of being caught, I had guilt feelings, I got to thinking about the fact that my oldest daughter is getting up to the age where she might be exposed to this element, and I didn't want to be a part of this element. I had many, many confusing and deep feelings at the time I went to the drug exemption officer.

Q. I see. Along the lines of that particular feeling . . . did the command have anything to do with that?

A. Yes, it did. The command offered me the opportunity to come clean and to bring it out into the open and get it all cleaned up and taken care of without legal recourse.

Mr. Hampton understood why the accused had come to him. He testified: "I felt that he was coming to me because of the comments I had made on the flight deck." He told the accused that he would "talk to the command and turn in the drugs, however, I would not reveal his name until I found out what considerations the command would show in his behalf for coming forward."

After having received Whipple's contraband, Mr. Hampton went to the executive officer about 5 p.m. The latter surprised him by guessing at once that it was Whipple who had come forward. The executive officer, when testifying before the judge, said that another enlisted man had come to him and

asked me if I had any names of persons that I might suspect of having cocaine

aboard, and I told him the names of those persons, and he said, well you missed the one person who master-minded the whole deal . . .

(He told the executive officer it was Whipple.) In the evening of the same day that Whipple turned in his cocaine, the drug exemption officer met with him again and informed him that the executive officer was aware of his identity; he urged Whipple to fill out the papers for a drug exemption application. He produced the application forms and assisted the accused in completing the necessary paperwork, and he "had him put down his drug history and drug involvement . . ." The Commandant Instruction setting forth the drug exemption program (Defense Exhibit A) required a "disclosure statement . . . as complete and detailed as possible;" presumably Mr. Hampton had the accused write out such a statement.

Still later that evening the accused met with the executive officer. The latter testified that the accused "wanted to know exactly what the command had in mind;" he informed Whipple

that I considered it a serious crime, it had already been done . . . and that I thought the only thing that he would have going for him at this point was cooperation, and I wanted his cooperation to clean up our ship and to find out who else was involved.

Trial counsel asked:

Did you tell him specifically whether or not he would be immune from prosecution as a result of his cooperating?

The executive officer replied:

No, I don't think I made a statement either yes or no, specifically. But I did tell him that I considered it serious, and the crime had been committed.

At this point, then, the close of the day on which Whipple had turned over his cocaine, at the same time plainly admitting to both the drug exemption officer and the executive officer that the cocaine was his, and that he had introduced it aboard the ship, he had not been told that he was NOT eligible for a drug exemption, or that the command would seek to prosecute him, or that the command would not consider granting him a drug exemption, or that his offense was such that he was not eligible for an exemption.

It may be noted here that Defense Exhibit A, the Commandant Instruction then in effect, provided in paragraph 8(c)(4):

Disclosures made in seeking Exemption are not privileged in any sense. They may be used for any and all purposes other than . . . court-martial actions, or separation with a discharge under other than honorable conditions affecting the individual who is seeking or has been granted Exemption. (emphasis added.)

Nine days after Whipple turned over his cocaine, an intelligence officer came aboard the ship, gave him a full Miranda-Tempia warning and conducted four interviews with him, one of which was taped. He testified orally as to the accused's confession.

Four weeks after the confession, the executive officer signed charges against the accused; they were referred for investigation under Article 32 UCMJ, 10 U.S.C. § 832, along with charges against other personnel of the GLACIER implicated by the accused. The accused gave compulsory testimony against the other accused persons at the investigation pursuant to five separate grants of testimonial immunity given him by the District Commander.

Article 31(b) UCMJ, 10 U.S.C. § 831(b) provides:

No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

■ The accused's action in producing and surrendering a shopping bag containing

what he identified as cocaine, while admitting to being its possessor, was a "statement" within the meaning of Article 31(b). The talks given on the flight deck of the GLACIER directly following a search for drugs amounted to a "request" for just such a statement. The executive officer's testimony shows that he had the names of persons he suspected of having cocaine in their possession, but Whipple's name was not one of them. Accordingly the accused was not "a person suspected of an offense" at the time of the request, in the sense that suspicion had not yet focused upon him; he was a suspect only in the sense that everyone in the crew was a suspect. We see no need to decide whether the omission of an Article 31(b) warning at the flight deck muster requires exclusion of the evidence of Whipple's verbal act,[2] in view of the events which more immediately preceded that act.

■ We accept the prosecution testimony as to these events. Mr. Hampton testified that when Whipple approached him, he "felt that drugs would be the end result of our conversation." He conducted Whipple into his stateroom, where Whipple said "that he had some stuff that he wanted to turn over to me" and after he identified the "stuff" as cocaine: "I indicated to him that I would receive the cocaine from him." At this point (if not some moments before), Whipple was a suspect. When Mr. Hampton invited him to produce and hand over the cocaine, a "person suspected of an offense" was being requested to make a "statement regarding the offense." The law required that he be warned under Article 31(b). No warning was given; therefore, the "statement"—the evidence as to Whipple's verbal act—could not lawfully be received against him. Article 31(d) UCMJ; *United States v. Pyatt*, 22 U.S.C.M.A. 84, 46 C.M.R. 84 (1972); *United States v. Corson*, 18 U.S.C.M.A. 34, 39 C.M.R. 34 (1968).

In stating that the law required a warning, we do not in the least imply any criticism of the drug exemption officer. Acting in good faith, in furtherance of the Commandant's declared policy to encourage drug disclosures, he quite properly omitted a warning. The Commandant Instruction stated that

disclosures must be made prior to the time a member is apprehended . . . or is officially warned . . . (Para. 5c)

In paragraph 8c.(8) it said:

Exemption applies only to disclosures which are made prior to apprehension for the drug offense in question and prior to the time the member is officially warned that he is suspected of the drug offense in question . . .

Accordingly a drug exemption officer would abstain from warning a person before offering to accept the corpus delicti of the person's offense. He would do so in order to preserve the member's eligibility for drug exemption, and also to avoid discouraging an imminent surrender of drugs.

However, the fact that the drug exemption officer acted justifiably in the context of the Coast Guard's drug program is beside the point. The point of concern for this court is that an incriminating statement requested of an accused, although unwarned, was used against him at his trial. A service regulation, or instruction, cannot make legal what a statute declares to be illegal. Obviously the Commandant Instruction cannot be accorded precedence over the requirements of Article 31 of the Code in judging whether evidence was lawfully received in a court-martial case. See *United States v. Seay*, 24 U.S.C.M.A. 7, 51 C.M.R. 57, 1 M.J. 201 (1975).

■ The accused's act of turning over the cocaine let the cat out of the bag. When the accused was questioned by the intelligence officer nine days later he had not been told that his prior "statement" could not lawfully be used in evidence against him; moreover he had been re-

2. Cf. *United States v. Wilson and Harvey*, 2 U.S.C.M.A. 248, 8 C.M.R. 48 (1953) with *United States v. Henry*, 21 U.S.C.M.A. 98, 44 C.M.R. 152 (1971). "Whether or not suspicion must have focused upon an individual within a group of people has not been definitely decided." DA Pam. 27–22, Evidence, p. 32–4 (1975).

quested to cooperate, "to clean up our ship" and to tell who else might be involved, with the possibility of drug exemption still open. Accordingly, the warnings given by the intelligence officer, who was fully aware of the prior act, were not enough to sever the presumptive influence of the unwarned admission. *United States v. Seay*, supra; *United States v. Pyatt*, supra; *United States v. Hundley*, 21 U.S.C.M.A. 320, 45 C.M.R. 94 (1972).

Since the conviction rests on unlawfully received evidence, it must be set aside.

We may reach the same result without reference to the warning requirements of Article 31(b).

Article 31 is entitled "Compulsory self-incrimination." Subdivision (a) of the Article stems from the Fifth Amendment privilege against self-incrimination. It is broader than the Constitutional privilege and provides:

> No person subject to this chapter may compel any person to incriminate himself or to answer any question the answer to which may tend to incriminate him.

The Manual for Courts-Martial 1969, paragraph 140a(2) gives us this fundamental rule of evidence:

> *Voluntariness.* To be admissible against him, a confession or admission of the accused must be voluntary. A confession or admission which was obtained through the use of coercion, unlawful influence, or unlawful inducement is not voluntary.[3]

As Wigmore observed, the test of voluntariness for confessions and admissions is virtually identical with the idea of compulsion as forbidden by the Fifth Amendment protection against self-incrimination. Evidence, § 2266 (1961 revision).

■ When the defense raised the voluntariness issue and moved to suppress the evidence expected to be offered by the prosecution, the burden was not on the defense to convince the judge that the accused's

damaging admissions had *not* been freely and voluntarily made. The rules of evidence require that:

> The admissibility of a confession or admission of the accused must be established by an affirmative showing that it was voluntary, unless the defense expressly consents to the omission of such a showing. (Para. 140a(2) MCM 1969).

Thus the burden was on the prosecution to furnish evidence of voluntariness and to convince the judge by a preponderance of the evidence that the accused's admissions were at least prima facie voluntary.

Plainly the handing over of the cocaine was not a spontaneous act, done without urging, request, invitation. Since it was not a *spontaneous* statement, it was an *obtained* statement. And the Manual says that an *obtained* statement

> may affirmatively be shown [to be] voluntary by proof that its making was not induced by a threat, promise, or use of duress amounting to coercion, unlawful influence, or unlawful inducement . . . (Para. 140a(2) MCM 1969).

■ This court cannot be precluded by the verdict of the jury from determining whether the circumstances under which the accused's verbal act was performed amounted to unlawful inducement; nor are we precluded by the preliminary ruling of the judge admitting the evidence, from determining whether the prosecution had affirmatively established voluntariness. The Code gives us the power independently to assess the evidence; "we cannot escape the responsibility of making our own examination of the record." *Spano v. New York*, 360 U.S. 315, 316, 79 S.Ct. 1202, 1203, 3 L.Ed.2d 1265 (1958).

■ The uncontroverted portions of the record reveal that the accused's act in coming forward with the cocaine was the result of an atmosphere of substantial inducement created by statements and actions of the authorities. First, there was the shake-

---

3. Following the statement of the voluntariness rule, the Manual gives "some instances of coercion, unlawful influence, or unlawful inducement." Among them are: "Promises of reward or benefit, or threats of disadvantage, likely to induce the accused to make the confession or admission."

down search for criminal goods, carrying an obvious threat of prosecution for those who were caught; then, there was the benevolent appeal to come in under the umbrella of the drug exemption program. What the accused had heard on the flight deck tended to induce a reasonable belief that an admission of drug possession, if made to the drug exemption officer, would be rewarded— that he could or would be sheltered from prosecution because of the drug exemption program. That it was completely reasonable for the accused to have entertained such a belief is confirmed by the actions of the drug exemption officer, after the accused had come forward and surrendered his contraband, in urging and assisting him to fill out the papers for a grant of exemption. The corollary of a hope reasonably entertained is that a promise was expressed or implied. A promise of reward or benefit (if not of immunity) was implied here: it amounted to unlawful inducement.

The testimony presented to the military judge was insufficient to establish that the "statement" made by the accused to the drug exemption officer and his later confession were NOT induced by promises of benefit or reward amounting to unlawful inducement, or that they were free and voluntary. The inducements which influenced the accused's surrender of the cocaine continued to operate; they had been reinforced, rather than removed, at the time he was questioned by and confessed to the intelligence officer. In the words of Chief Judge Quinn:

> If the Government illegally obtains evidence which is likely to produce a subsequent confession, and, in fact the accused later confesses, it is reasonable to conclude that the confession was more the product of the illegal evidence than the expression of the free will of the accused.[4]

That was the case here. The evidence should have been excluded; it was prejudicial error to receive it.

■ Our conclusion that the evidence on which the verdict of guilty rested was un-lawful evidence makes it unnecessary to discuss other assigned errors, except for the contention that the court-martial had no jurisdiction of the person of the accused because his enlistment was void.

The accused had completed a four-year enlistment on 5 April 1974 and was discharged. At the time of discharge, a career counselor informed him that if he reenlisted within 90 days he would be entitled to a $10,000 Variable Reenlistment Bonus (VRB). The information was correct when given.

On 26 May, within the 90 days, Whipple applied for reenlistment. However the reenlistment was not effected until 11 June 1974 because of administrative delays. Meanwhile, on 1 June 1974, the VRB program was replaced by the Selective Reenlistment Bonus program, pursuant to an official announcement dated 14 May 1974. The recruiter who reenlisted Whipple was unaware of this announcement.

On 12 June 1974 on reporting to the Alameda Training Center, Whipple learned that he was not entitled to a VRB. He wrote to Coast Guard Headquarters in protest on 2 July 1974. An official reply on 26 July 1974 expressed regret that the Service could not "rectify the apparent injustice which you have encountered" and suggested that he apply to the Board for Correction of Military Records.

He did so. He also, on 12 January 1976, requested a discharge for the convenience of the government. Headquarters, on 5 February 1976, authorized such discharge, but the discharge could not be effected while the accused was at sea aboard the GLACIER. Before the GLACIER returned to the United States, the events which led to the instant court-martial occurred; and justified non-exercise of the authority to discharge.

The lack of accurate information as to Whipple's eligibility for a VRB by both Whipple and the recruiting officer, and the administrative delay in effecting the enlistment, with its unintended consequence, did

4. *United States v. Spero*, 8 U.S.C.M.A. 110, 113, 23 C.M.R. 334, 337 (1957).

not render the enlistment contract void. The accused was lawfully enlisted and retained in the Coast Guard, and the court had jurisdiction of his person. (On 5 November 1977, the decision of the Board for Correction of Military Records changed Whipple's reenlistment date to 31 May 1974.)

The findings of guilty and the sentence are set aside. The charges are dismissed.

Judge ALCANTARA concurs; Judge MAGUIRE concurs and filed separate opinion. Judge LYNCH filed separate opinion concurring in part and dissenting in part. Judge BURGESS did not participate in the decision in this case.

MAGUIRE, Judge, concurring:

I concur in the result and also in the opinion of the court. In view of my belief that cocaine is not a "controlled substance" and the potential difficulty of reconciling "old-line" Article 134 offenses with the actual existence of regulations, created by the ruling in United States v. Courtney, 24 U.S. C.M.A. 280, 51 C.M.R. 796, 1 M.J. 438 (1976), there would be enormous difficulty in sorting out the implications of the rationale of that decision vis-a-vis the instant charges. There is no point to undertaking the task since a dismissal results here anyway.

LYNCH, Judge, concurring in part, dissenting in part:

I

I concur that the findings of guilty and the sentence should be set aside and the charges dismissed. This is based on my concurrence with the majority that the statements of the defendant to Chief Warrant Officer Hampton, Commander Coste, and LCDR Hamilton following the surrender of the shopping bag by the defendant, were improperly admitted into evidence. For the reasons stated below I disagree with the majority, however, that the military judge erred in admitting into evidence the shopping bag and its contents.

Basically, I do not construe the circumstances surrounding the initial contact between the defendant and CWO Hampton in the same way as my colleagues. I view the scene as portraying a petty officer in possession of a substantial quantity of cocaine, who two days earlier had been forewarned that a full and thorough search of the ship would be conducted until all drugs were found and disposed of. He had also, as a member of the crew at a lecture on the fantail, heard about a drug exemption program. These events caused him to do some serious thinking about his situation, and after considerable thought about many things, approached CWO Hampton. The petty officer, apparently emotionally upset, distraught, and tearful, indicated that he had "something to turn in" and wanted Mr. Hampton to accompany him to the operations berthing. Because of the petty officer's condition, Mr. Hampton took him to the privacy of his stateroom to calm him down, and a short time later the petty officer brought forward and turned over to Mr. Hampton a shopping bag with several plastic packets of what was ultimately established to be cocaine.

The majority initially finds that Mr. Hampton was required to advise the defendant pursuant to Article 31, UCMJ, and his failure to do so rendered the shopping bag and its contents inadmissible. Secondarily the majority finds that the defendant was subjected to illegal inducement or coercion as a result of the lecture on the fantail two days prior to his surrender of the real evidence and therefore the shopping bag and its contents are inadmissible.

As to the initial conclusion, I do not believe the situation at the time of the defendant's surrender of the shopping bag and its contents mandated a warning pursuant to Article 31, UCMJ. I construe the encounter between the defendant and CWO Hampton as similar to a "threshold confession" and thus exempt from the warning requirements of Article 31, UCMJ.

As to the issue of illegal inducement or coercion, CWO Hampton was asked whether he believed that the defendant was com-

ing to him because he was the drug exemption officer, and Mr. Hampton responded:

"Not at first, because I had to prompt him to indicate that he wanted a drug exemption, but he was quite emotionally upset." (R. 92)

And, when asked whether he had any doubt whether the defendant was approaching him with the drug exemption program in mind, Mr. Hampton replied:

"I think it was a secondary thing. I think his first . . . my first impression of it was that he was worried about detection and I certainly think that was uppermost in his mind because I had to prompt him to the drug exemption . . . ." (R. 92)

The defendant testified during cross-examination:

"Q. What was the primary motive for your coming forward in this procedure (the turning in of the drugs to CWO Hampton)?

A. I had many reasons that were interrelated and probably of equal validity and weight. I had guilt feelings, I had fear, my use was becoming very heavy, I was afraid for my own health, I was afraid of being caught, I had guilt feeling, I got to thinking about the fact that my oldest daughter is getting up to the age where she might be exposed to this element, and I didn't want to be a part of this element, I had many, many confusing and deep feelings at the time I went to the drug exemption officer." (R. 122)

Q. You indicated that you had numerous reasons for coming forward, and one was your family situation, your own personal sense of well-being. Now my question is, what did the command do to influence that particular feeling? Did it come from the command or did it come just from you?

A. At the prompting of the command, I started thinking about this and I came to these feelings. (R. 123)

Q. I see. Was there another reason for your coming forth, based on religious convictions?

A. Yes, there was. (R. 123)

The testimony of CWO Hampton and the defendant makes it clear to me that, while the "lecture" on the fantail may have started the defendant thinking about his entire situation, it most certainly did not constitute the unlawful coercion or unlawful inducement found by the majority, and I must dissent from that conclusion.

II

In view of the disposition of this case, the majority find it unnecessary to decide the counsel issue raised on appeal. Although not necessary, I believe it appropriate to treat this issue since the question concerning the relationship between Articles 27 and 38, UCMJ, 10 U.S.C. §§ 827, 838, is being raised with increasing frequency.

In this case, LT B represented the defendant at the pretrial investigation conducted pursuant to Article 32, UCMJ. That investigation concluded on 4 June 1976. On 9 June 1976, three weeks before a convening order was signed, apparently under the belief that some of the charges investigated would ultimately be referred to trial by court-martial, the defendant submitted a request for LT C "as individual military counsel (IMC)" pursuant to Article 38, UCMJ and paragraph 48, MCM, 1969 (Rev.). On 10 June 1976, LT C was made available to serve as individual military counsel by his commanding officer. On 17 June 1976, the convening authority informed LT C's commanding officer that "LT C, as requested individual military counsel, will be detailed to court involving [the defendant]." On 30 June 1976, the convening order was signed which included LT C as the defense counsel detailed to represent the defendant.

The issue, as framed by appellate defense counsel, alleges that the defendant was deprived of his rights to counsel through the convening authority's failure to provide a "detailed counsel" in addition to the "individual military counsel."

Basically, the defense argument is that Article 27, UCMJ and Article 38, UCMJ each creates a right to counsel independent of the other, and therefore a military defendant is entitled to two defense counsel—one "detailed counsel" pursuant to Article 27, UCMJ, and one "individual military counsel" pursuant to Article 38, UCMJ.

While on the surface a logical argument can be made to support this proposition by reading these two articles independently of each other, it is my opinion that this proposition must fail when the rights of a defendant and the responsibilities of a convening authority are viewed as a whole under the Code, and these two articles are placed in perspective.

Article 27(a), UCMJ, imposes upon an authority convening a court-martial the duty and responsibility to insure that a defense counsel is detailed as a participant to represent the defendant. The remainder of Article 27, UCMJ sets forth the circumstances under which counsel, detailed pursuant to subsection (a), must be a lawyer.[1]

Article 38(b), UCMJ, sets forth the right of a defendant to select an individual military or civilian counsel to represent him at a court-martial. This provision, in my opinion, exists as a right guaranteed to a defendant that he need not be satisfied, or limited to, a defense counsel selected, and detailed to a court, by a convening authority, but may request an individual military counsel, or retain civilian counsel to represent him.[2]

The principles contained in Articles 27 and 38, UCMJ are not new to military law with the creation of the Uniform Code.

Both these articles were derived from Articles of War 11 and 17, and existed prior to the adoption of the Code.

It is clear to me that Article 27, UCMJ focuses on a duty or responsibility of the convening authority, whereas Article 38(b) focuses on a right of a defendant. The pattern that emerges is equally clear. If an accused has not exercised his right to request an IMC pursuant to Article 38(b) at the time a convening authority convenes a court-martial, then the convening authority is under a duty to select a defense counsel to represent the defendant and detail him as a participant pursuant to Article 27(a). If, however, prior to the convening of a court-martial, an accused exercises his right under Article 38(b) to request an individual military defense counsel, and that counsel is reasonably available, then at the time the convening authority's duty arises under Article 27(a) to detail a defense counsel as a participant in the court-martial, the convening authority is obligated to insure that the counsel selected by the accused is detailed to represent him.

The evils that are sought to be avoided by Articles 27 and 38 UCMJ are those of an unrepresented defendant, in the case of Article 27, and of a defendant being represented by a counsel of the convening authority's choice rather than counsel of the defendant's choice, in the case of Article 38.

Counsel who assert that the decisional law involving Articles 27 and 38, UCMJ establishes a "right to two lawyers" are misreading what the Court of Military Appeals has said. Essentially what the Court of Military Appeals has said is that once a

---

1. It is interesting to note that during the hearings on the proposed UCMJ, the only concern expressed with respect to Article 27 was that the defense counsel required to be detailed by a convening authority should be a qualified lawyer. Hearings Before House Armed Services Committee on H.R. 2498, 81st Cong., 1st Sess. pp. 789, 1155–56, 1164–69. See also, Hearings Before Senate Armed Services Committee on S. 857 and H.R. 4080, 81st Cong., 1st Sess. pp. 184, 257–58, and 319.

2. The major concern expressed with respect to Article 38(b) during the hearings on the proposed UCMJ appears to be limited to the words "if reasonably available." Because of the fear of command control in selecting a defense counsel for detailing pursuant to Article 27, the argument was that the command should not also control the availability of the individually selected counsel when requested pursuant to Article 38(b). It was urged that the "if reasonably available" language be eliminated. See, e. g., Hearings Before House Armed Services Committee on H.R. 2498, 81st Cong., 1st Sess. at 684.

convening authority details a lawyer to represent a defendant pursuant to Article 27, the convening authority may not discharge or relieve that counsel when, subsequently, a defendant elects to exercise his right to an IMC pursuant to Article 38(b). In other words, once an attorney-client relationship has been established between a defendant and a counsel detailed pursuant to Article 27, only the defendant can discharge or terminate the relationship with that counsel.[3]

It is therefore my opinion that the law does not prevent a prospective convening authority from determining the particular desires of an accused concerning an individual military lawyer to represent him, and then incorporating those desires into the order convening the court by detailing that individually requested military lawyer to represent the accused at trial as required by Article 27, UCMJ.

---

3. See, e. g., *United States v. Falls*, 20 U.S.C.M.A. 618, 44 C.M.R. 48 (1971); and *United States v. Tellier*, 13 U.S.C.M.A. 323, 32 C.M.R. 323 (1962).